**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

                                      Case No. 01-71679

v.                                   Hon. Gerald E. Rosen

SIX NEGOTIABLE CHECKS IN VARIOUS
DENOMINATIONS TOTALING ONE HUNDRED
NINETY ONE THOUSAND SIX HUNDRED SEVENTY
ONE DOLLARS AND SIXTY NINE CENTS ($191,671.69),
and EIGHT THOUSAND FIVE HUNDRED FIFTY NINE
DOLLARS IN UNITED STATES CURRENCY ($8,559.00),

        Defendants.

_____/

**OPINION AND ORDER SETTING FORTH THE**
**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 30, 2005_____

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

Plaintiff United States of America commenced this suit on April 30, 2001, seeking

the civil forfeiture of the Defendant negotiable checks and U.S. currency, which were

seized on November 28, 1998 by agents of the U.S. Customs Service at the Detroit

Metropolitan Wayne County Airport in Romulus, Michigan.  The Government alleged in

its complaint that there is probable cause to forfeit this property, because the checks and

currency are monetary instruments that Leila Farha attempted to transport out of the United States without properly reporting them to customs agents as required under 31 U.S.C. § 5316.  Two Claimants, Leila Farha and her husband Amado Faria, filed claims in opposition to the Government's forfeiture effort, asserting that they were entitled on a number of grounds to the return of the Defendant property that the Government had seized from Leila Farha.

In an earlier Opinion and Order, the Court held that the Government had met its threshold burden of demonstrating that the Defendant property is subject to forfeiture, but that issues of fact remained as to (i) whether Claimant Amado Faria could successfully invoke an "innocent owner" defense to forfeiture, and (ii) whether forfeiture of the entire amount seized from the Claimants would violate the Excessive Fines Clause of the Eighth Amendment.  See United States v. Six Negotiable Checks, 207 F. Supp.2d 677 (E.D. Mich. 2002).  Accordingly, the case proceeded to trial by the Court in order to resolve these outstanding issues.  In the course of this trial, the Court heard the testimony of Claimant Amado Faria, U.S. Customs Special Agent James Sinnott, and IRS Revenue Agent Carl Selz.  In addition, a number of exhibits were received into evidence.

Having heard the testimony of the witnesses and reviewed the exhibits introduced at trial, and having reviewed and considered the Government's and the Claimants' post-trial submissions, the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are so

2

2:01-cv-71679-GER   Doc # 32   Filed 09/30/05   Pg 3 of 28   Pg ID 118

adopted.

## II.  <u>FINDINGS OF FACT</u>

**A.     The Seizure of the Defendant Property at Detroit Metropolitan Airport**

1.     On November 28, 1998, U.S. customs officials stopped and questioned Claimant Leila Farha as she was about to board Northwest Airlines Flight Number 68 at the Detroit Metropolitan Airport in Romulus, Michigan.

2.     Farha, a naturalized U.S. citizen, had planned to travel from Detroit to Tel Aviv, Israel, along with several other members of her family who had gathered in Michigan for the Thanksgiving holiday.

3.     According to the testimony of U.S. Customs Special Agent James Sinnott, and as corroborated in an investigative report prepared by Special Agent Sinnott shortly after the incident, (<u>see</u> Gov't Ex. 9), Farha declared to customs officials at the airport that she was carrying $9,000.00 in U.S. currency.  Upon being given the opportunity to amend her declaration, Farha declined, and again maintained that she was carrying only $9,000.00 in cash.

4.     Customs agents then searched Farha's purse and discovered approximately $8,500 in cash, along with 13 commercial checks totaling $250,671.69.  Six of these checks were negotiable, totaling $191,671.69.  These six checks, along with the cash that Farha was carrying, are the property at issue in this civil forfeiture action.[1]

_____

[1]Seven non-negotiable checks totaling $59,000 were returned to Farha in the course of administrative forfeiture proceedings, and are not at issue here.

5.     Upon discovering these undeclared items, customs officials escorted Farha to an office at the airport, where Special Agent Sinnott advised Farha of her <u>Miranda</u> rights and questioned her further about the checks found in her purse.

6.     In the course of this questioning, Farha stated that the two largest negotiable checks, in the amounts of $107,117.98 and $64,553.71, were the proceeds of a sale of certain land in Florida.  These checks were made out to, and appeared to have been endorsed by, Farha's husband, Claimant Amado Faria, and her daughter, Reema Faria, along with an individual named Ishak Hussein Aoudi.  (<u>See</u> Claimants' Ex. A.)[2]

7.     According to Special Agent Sinnott, Farha claimed during questioning that she had forged the signatures on these checks, and that her husband was not aware that she had these checks in her possession or that she planned to take them out of the country.

8.     Special Agent Sinnott then telephoned Claimant Amado Faria at the residence where he and his wife had been staying during their visit to Michigan. According to Special Agent Sinnott, Faria contradicted his wife by acknowledging his awareness that she had the two above-mentioned checks in her possession as she prepared to board the airplane that day.  Faria also stated, contrary to his wife, that he had signed both of the checks, and that he had witnessed his daughter Reema sign both checks.

9.     As a result of this incident, Leila Farha was criminally charged with violating 31 U.S.C. § 5316 and was sentenced to six months of pretrial diversion.  She

---

[2]As discussed below, Aoudi was the purchaser of the Florida property, while Amado and Reema Faria were the prior owners and sellers of this property.

4

successfully completed this program and the criminal proceedings were dismissed

without a record of conviction.  Farha was not called as a witness at the trial in the present

case.

**B.      The Testimony of Claimant Amado Faria Regarding the Two Largest
        Negotiable Checks.**

10.     The principal witness at trial was Claimant Amado Faria.  Faria is the

husband of Claimant Leila Farha and, like his wife, is a naturalized U.S. citizen.[3]  Faria

and Farha reside in Tampa, Florida.

11.     Faria testified that the two largest checks seized in this case, in the amounts

of $107,117.98 and $64,553.71, were the proceeds of a 1998 real estate transaction

involving a convenience store located at 1115 57th Avenue West in Bradenton, Florida.

12.     In March of 1996, Faria and his daughter Reema sold this business property

to Ishak Aoudi for $360,000, with a down payment of $100,000 and the balance to be

paid in monthly installments of $2,500 over 30 years.

13.     In the fall of 1998, Aoudi obtained additional financing and purchased the

Farias' remaining interest in the property at 1115 57th Avenue West.  The two above-

referenced checks, dated October 28, 1998 and made out to Amado and Reema Faria and

Ishak Aoudi, were disbursed to the Farias as part of this transaction.[4]

---

[3]The similar spelling of the couples' last names — Faria and Farha — is merely
coincidental.

[4]Faria testified at trial that the disbursement via two separate checks was likely the
product of Ishak Aoudi's structuring of the transaction and sources of financing at the time of
closing.

14.     Faria confirmed that the two checks were signed by himself, his daughter Reema, and Ishak Aoudi.

15.     At the time of this transaction in the fall of 1998, Faria planned to reinvest the proceeds of this sale into the purchase of a building in Tampa, Florida.

16.     On October 25, 1998, Faria executed a written offer to purchase the Tampa property for $550,000.  Faria testified that he gave the two above-referenced (and signed) checks to a real estate broker in connection with this offer.

17.     The written offer documentation reflects that Faria gave a deposit of $50,000 in support of his offer on the Tampa property.  Faria testified that he initially wrote a $50,000 check as a deposit, but that he supplanted this initial deposit with the two checks, totaling $171,671.69, that he subsequently received in late October or early November from the sale of the Bradenton property.  Although Faria stated that he was given a receipt reflecting this larger deposit, he was unable to produce any such receipt.

18.     Faria's offer on the Tampa property was rejected in favor of a higher bid, and the broker then returned the two checks to him.  Faria testified that he picked up the checks from the broker's office on or around November 20, 1998.

19.     Although both Faria and his wife had bank accounts in Tampa, Faria testified that his wife initially put the two checks in her purse for safekeeping, with the intention that they eventually would be deposited in one of the couple's bank accounts.

20.     Within the next day or so after Faria purportedly retrieved the two checks from the real estate broker, he and his wife traveled to Ann Arbor, Michigan to spend the

6

Thanksgiving holiday with relatives.  Faria testified that the checks remained in his wife's purse during this trip, a circumstance he characterized as "stupid" and attributed to lack of time to get to a bank before leaving for Michigan.

21.     Faria testified that he was unaware that the two checks were negotiable and could be endorsed and cashed by anyone who obtained them.  Rather, he believed that only he or his daughter could cash the checks.  He acknowledged, however, that he had cashed checks for customers as a convenience store operator, which he then submitted for deposit into his own bank account.

22.     Faria testified that, during this Thanksgiving visit to Michigan, his wife was urged by a number of her relatives to join their upcoming trip to Israel to visit another family member.  Although Faria opposed this plan, his wife decided to make the trip.

23.     While Faria knew that the checks had been placed in his wife's purse before the couple left for Michigan, he testified that he did not think about or discuss the checks while in Michigan, nor did he realize that they remained in his wife's possession as she prepared to embark on her trip to Israel.

24.     As noted during Faria's cross-examination, Faria's testimony on this point conflicts with the investigative report of Leila Farha's November 28, 1998 detention by customs officials.  The investigative report indicates — and Special Agent Sinnott verified in his testimony at trial — that Faria acknowledged his awareness of his wife's possession of the checks when Special Agent Sinnott contacted him by telephone shortly after his wife's detention.

7

25.     Faria acknowledged that he has an account at a bank in Israel.  He further testified that he opened this account in 1999, but he lacked any statements or records that might verify this.  Rather, he produced only a statement from December of 2001.

26.     Faria denied any intention to have his wife carry the two checks to Israel as a means of evading tax obligations or otherwise hiding the proceeds of his sale of the Bradenton property.  First, he claimed that he had no accounts in Israel at the time in which to deposit the checks.  Next, he opined that the funds would be traceable, in any event, when the checks were presented for payment at the Florida bank from which the funds were drawn.  Faria acknowledged, however, that he did not know whether the Florida bank would issue any sort of transaction or currency report upon receiving the checks for payment from overseas.

**C.     Amado Faria's Testimony on Other Matters**

27.     Amado Faria has two 1996 felony convictions in Sarasota County, Florida, for food stamp fraud and dealing in stolen property.  The judgments of conviction were admitted at trial under Fed. R. Evid. 609(a)(2) as evidence of crimes involving dishonesty.

28.     Faria testified that he received an accounting degree in the early 1970s from Cleary College in Ypsilanti, Michigan.

29.     Federal tax returns for Amado Faria and Leila Farha were introduced at trial for the years 1994 through 2000.  All of these returns, however, were signed in August of 2002, shortly before the trial in this case.  In addition, the Government introduced a

8

"Certification of Lack of Record" dated August 29, 2002, reflecting that neither Faria nor his wife had filed tax returns for 1996 through 2000 as of that date.  (See Gov't Ex. 7.)

30.    Faria testified that he did not believe that he had to file federal tax returns so long as he and his wife did not owe any taxes.  Because the couple's losses purportedly exceeded their income and gains between 1994 and 1999 — with the apparent exception of 1998[5] — Faria stated his belief that he and his wife were under no obligation to file tax returns for those years.

31.    The couple's belated tax return for 1998 does not disclose the two largest checks at issue here, totaling $171,671.29.  Faria testified that, in his view, these checks did not need to be declared as gains from the sale of the Bradenton property, because the Government had seized the checks before he was able to present them to a bank for payment or otherwise make any use of the proceeds of the property sale.

32.    Regarding the remaining four negotiable checks totaling $20,000 and the $8,559.00 in U.S. currency seized from his wife on November 28, 1998, Faria testified that the currency was "family money," and that the checks, similarly, were received as payment for the sale of jewelry that he regarded as a "family" resource.  Faria conceded on cross-examination, however, that he had testified at his deposition that the currency was his wife's money and that the jewelry also was hers.  Faria also testified that the previous checks that had been received and cashed in connection with this jewelry

---

[5]The 1998 tax return that was admitted into evidence reflects taxes owed in the amount of $1,699 for that year.

9

transaction had been deposited into his wife's Florida bank account.

**D.     Other Relevant Testimony and Evidence at Trial**

33.     The Government introduced a U.S. Department of Treasury Advisory dated July 2000, in which banks and other financial institutions are alerted to "serious deficiencies in the counter-money laundering systems of the State of Israel."  (Gov't Ex. 8, FinCEN Advisory at 1.)  This Advisory states that "[f]inancial institutions operating in Israel are not required to report suspicious transactions" or "maintain complete records of customer transactions," thereby "increas[ing] the possibility that transactions involving Israel will be used for illegal purposes."  (Id. at 1-2.)

34.     The Government also offered the testimony of IRS Revenue Agent Carl Selz regarding the obligation of Claimants Leila Farha and Amado Faria to file federal tax returns and other tax-related issues.

35.     Agent Selz opined that Claimants were required by law to file tax returns for the years 1996 through 2000, even if they owed no taxes, because they met the minimum gross income thresholds for each of those years.  (See also Gov't Ex. 13, Filing Thresholds for Years 1996-2000.)

36.     Agent Selz further testified that Claimants' belatedly prepared tax returns for 1996 through 1998 appeared to have misreported the $100,000 payment received from Ishak Aoudi for the 1996 sale of the Bradenton property, as well as the subsequent monthly payments of $2,500 that Claimants received from Aoudi until they sold their remaining interest in the property in the fall of 1998.  Agent Selz opined that these

10

amounts apparently were disclosed in Claimants' 1998 return — and, even then, seemingly not in the proper fashion — rather than in the years in which the payments actually were received.

37.     Agent Selz also opined that the two checks totaling $171,671.69 received by Amado Faria in October of 1998 should have been reported on Claimants' 1998 tax return, notwithstanding the fact that these checks were seized from Leila Farha on November 28, 1998.  Because Faria was able to gain access to the $171,671.69 in funds as soon as he received the checks, Agent Selz testified that Faria was in "constructive receipt" of the funds at that point, and that it did not matter, for tax purposes, whether the checks were lost or taken from him a short time later.

### III.  <u>CONCLUSIONS OF LAW</u>

**A.     Claimant Amado Faria Has Not Established an "Innocent Owner" Defense to Forfeiture of the Subject Property.**

1.     In its prior Opinion and Order in this case, the Court found that the Government had met its threshold burden of demonstrating that the Defendant property was subject to forfeiture under 31 U.S.C. § 5317(c).  <u>See</u> <u>Six Negotiable Checks</u>, 202 F. Supp.2d at 685.  The Court further held that Claimant Leila Farha could not establish an "innocent owner" defense to forfeiture, as she had committed the act — namely, the failure to report the negotiable checks she was carrying when asked by customs officials to do so — that triggered forfeiture of the Defendant property, and therefore necessarily had knowledge of the conduct giving rise to the forfeiture.  202 F. Supp.2d at 687.

11

2.      In light of these rulings, the principal issue for trial was whether Claimant Amado Faria could establish an "innocent owner" defense to forfeiture, even if his wife could not do so.

3.      The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983, expressly incorporates an "innocent owner" defense to forfeiture.[6]  Specifically, the Act provides, in relevant part:

**(d)  Innocent owner defense. —**

(1)  An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

(2)(A)  With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who —

(i) did not know of the conduct giving rise to forfeiture; or

(ii)  upon learning of the conduct giving rise to the forfeiture, did all that could reasonably be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(d).

4.      Based on the testimony at trial, the Court finds that the "innocent owner" defense, if applicable, would apply only to the two largest negotiable checks totaling $171,671.69.  As noted in the Court's earlier Opinion and Order, this defense is available

---

[6]In its prior ruling, the Court held that the CAFRA standards govern this forfeiture proceeding.  See Six Negotiable Checks, 202 F. Supp.2d at 682-83.

only to an individual who possesses a "property interest" in the subject property.  See Six
Negotiable Checks, 202 F. Supp.2d at 686-87 (citing 18 U.S.C. § 983(d)(2)(A)); see also
18 U.S.C. § 983(d)(6) (defining the "ownership interest" necessary to assert an "innocent
owner" defense); United States v. One Lincoln Navigator 1998, 328 F.3d 1011, 1014-15
(8th Cir. 2003) (construing this provision).  As to the remaining four checks totaling
$20,000 and the $8,559.00 in U.S. currency seized from Leila Farha on November 28,
1998, the trial testimony of Claimant Amado Faria does not establish the requisite
"property interest" to sustain an innocent owner defense.  While Faria testified at trial that
the checks and currency were "family" assets belonging equally to him and his wife, he
stated in his prior deposition testimony that this property belonged solely to his wife, and
other evidence — *e.g.,* Faria's acknowledgment that other checks received in the same
jewelry transaction that produced the four seized checks were deposited into his wife's
bank account — tends to corroborate his deposition versus his trial testimony on this
point.  In addition, Claimants have conceded in a post-trial submission that the
"$20,000.00 in checks and $8,559.00 in U.S. currency were claimed only to belong to
Leila Farha," (see Claimants' Post-Trial Proposed Findings of Fact and Conclusions of
Law at 8), and they have not endeavored to show how Amado Faria might be deemed an
"owner" of this property within the meaning of CAFRA.

     5.     In contrast, there is no dispute that Amado Faria had a property interest in
the two largest negotiable checks, both of which were made out to Faria and his daughter.
The question, then, is whether Faria "kn[e]w of the conduct giving rise to forfeiture," 18

U.S.C. § 983(d)(2)(A)(i) — that is, whether he knew that his wife would fail to report the negotiable checks to customs officials, thereby triggering forfeiture under 31 U.S.C. § 5317(c) when customs officials discovered this omission.

6. Faria denied any such knowledge in his testimony at trial. While he acknowledged his awareness that his wife had placed the checks in her purse before the couple traveled from Florida to Michigan, he testified that he no longer thought about the matter once in Michigan, and that he did not realize that the checks remained in his wife's possession as she prepared to accompany her relatives on a trip to Israel. Thus, Faria claims that he did not know that his wife still had the two largest negotiable checks as she passed through customs on her planned trip to Israel, much less that she would fail to report these checks when requested to do so by customs officials.

7. For a number of reasons, the Court finds that Faria has not met his burden of proving the "innocent owner" defense by a preponderance of the evidence. First, the Court rejects as utterly implausible Faria's testimony that he and his wife brought two negotiable checks totaling $171,671.69 to Michigan through mere inadvertence, rather than by design. Even crediting Faria's testimony regarding the timing of his receipt of these checks, he had perhaps a day or two to deposit these checks into his or his wife's Florida bank accounts before the couple left on their Thanksgiving trip to Michigan. Given the size of these checks, the Court finds that Faria certainly would have taken the brief time necessary to deposit them in the bank if he had intended to do so.

8. Moreover, the Court finds it likely that Faria had an even greater

14

opportunity to deposit these checks in a Florida bank before leaving for Michigan, had he intended to do so. Although Faria testified that he gave the checks to a broker for two or three weeks in connection with a pending offer to purchase property in Tampa, he failed to produce any documentary evidence of this transaction. To the contrary, the written documentation reflects that Faria put down a deposit of only $50,000 in support of this offer. Nor did Faria provide a satisfactory explanation why he would give two negotiable checks totaling $171,671.69 to a broker to hold in connection with his pending offer, much less why he would not insist upon the execution of documentation establishing some sort of secure escrow account in which to place these fully negotiable instruments.

9.      Beyond the implausibility of Faria somehow forgetting that he and his wife had left Florida for Michigan with two large negotiable checks in their possession, Faria's "innocent owner" defense also would require the Court to accept that ***Faria's wife*** forgot about the checks — or, at a minimum, that she failed to remind her husband that the checks were still in her purse. After all, if either Faria or his wife had thought about the checks and intended to deposit them in Florida before traveling to Michigan, they readily could have done so. In addition, if Leila Farha had recalled her continuing possession of the checks while she and her husband were in Michigan, and had wished to avoid carrying them on her trip to Israel, she presumably would have reminded her husband about the checks and asked what should be done with them. Yet, Faria did not testify to any such conversation, meaning that, under his account, ***both he and his wife*** must have forgotten about these two large negotiable checks. Notably, Leila Farha was not called

15

upon to testify in support of this highly implausible account.

10.      Faria's appeal to the "innocent owner" defense is further weakened by the evidence that Leila Farha lied to customs officials about the checks when she was detained at the airport on November 28, 1998.  Specifically, the investigative report of this detention, as confirmed in the trial testimony of Special Agent Sinnott, recounted Farha's statements that she forged all of the signatures on the two checks, and that her husband was not aware that she had the checks in her possession.[7]  Faria promptly contradicted his wife on both of these points upon being contacted by customs officials. If Leila Farha's possession of the checks as she prepared to leave for Israel was merely inadvertent and wholly innocent, she seemingly would have had no reason to lie to customs officials about these checks.  And, again, Farha was not called as a witness at trial in an effort to explain this paradox.

11.      What is more, Faria's own account of this incident has not been entirely consistent over time.  As noted, at the time of his wife's detention, he told customs officials that he was aware that his wife had the checks in her possession as she was leaving for Israel.  Faria testified similarly at his deposition, as observed in the Court's prior Opinion and Order.  See Six Negotiable Checks, 207 F. Supp.2d at 680.  Yet, at trial, he testified, in essence, that the checks had slipped his mind, and that he did not realize that his wife still had the checks as she left on her overseas trip.

---

[7]According to the report, Farha also falsely identified her daughter Reema as her sister.

12.     Faria also testified at trial that he was unaware that the signed, negotiable checks could be cashed by anyone who came into their possession.  Yet, his experience with this practice as the operator of a convenience store, as well as his educational background with a degree in accounting, utterly belies this claim.

13.     The indicia in the record of tax evasion — or, at a minimum, failure to file federal tax returns when required to do so — further undercut Faria's effort to establish an "innocent owner" defense.  Despite his accounting background, Faria failed to file federal tax returns for several years in succession, under the dubious (and legally incorrect) theory that he did not owe taxes for those years.  Even this claim, moreover, was proven false by the evidence at trial — specifically, Faria's tax returns, prepared only on the eve of trial — which demonstrated that Faria in fact owed taxes for at least two of the years in question, 1998 and 2000.

14.     This record of tax avoidance not only establishes a history and pattern of such conduct, but also supplies a motive for Faria to attempt to remove the negotiable checks from the country without properly declaring them to customs officials.  The Government introduced evidence that, at the time the checks were seized, Israel's banking system was considered by the U.S. government to be deficient in its record-keeping and reporting practices, thereby increasing the likelihood that this banking system would be used in transactions that were intended to serve illegal purposes.  Although Faria testified to his view that a check drawn from a U.S. bank account would produce a paper trail and reporting activity even if cashed in Israel, he acknowledged his lack of knowledge or

17

expertise on this subject, and Claimants did not otherwise produce any evidence to bolster this theory.  Similarly, while Faria claimed that he did not have a bank account in Israel at the time, and that he first opened such an account the following year, the documentation he produced on this point — a single bank statement from 2001 — lent little, if any, support to his testimony.

15.     More generally, there were various other indicia in the record at trial of Faria's lack of credibility.  The Government introduced records of Faria's two felony convictions for crimes involving dishonesty, food stamp fraud and dealing in stolen property.  Faria's efforts to explain these convictions further undermined, rather than enhanced, his credibility, as he claimed variously that he was entrapped, that he was acting to protect his children, and that one of the relevant transactions — an attempted purchase of $21,000 in either cigarettes or computer equipment — was intended for personal use only.  Moreover, this testimony fit into a larger pattern of Faria's ever-changing stories and explanations on a number of matters, as well as an overall demeanor that tended to detract from his credibility.

16.     Considering this record in its totality, the Court finds that Faria's testimony was almost wholly without credibility on any material issue in this case.  Consequently, he was unable to support with credible evidence his claimed lack of knowledge (i) that his wife was carrying the two negotiable checks as she embarked on her trip to Israel, and (ii) that she would fail to disclose her possession of these checks to customs officials.  As noted, it is Faria's burden to prove all of the elements of an "innocent owner" defense by

18

a preponderance of the evidence.  The Court finds that this burden has not been met.

**B.     The Forfeiture of the Entirety of the Defendant Property Seized from Leila Farha Does Not Violate the Excessive Fines Clause of the Eighth Amendment.**

17.     In addition to arguing that Amado Faria's status as an "innocent owner" should preclude the forfeiture of the two largest negotiable checks seized by the Government on November 28, 1998, Claimants also maintain that the forfeiture of the entirety of the Defendant property would violate the Excessive Fines Clause of the Eighth Amendment.

18.     The Supreme Court's decision in United States v. Bajakajian, 524 U.S. 321, 118 S. Ct. 2028 (1998), sets forth several principles that are relevant to this Court's "excessiveness" inquiry.  First, although Bajakajian involved a criminal forfeiture, the Supreme Court emphasized that a statutory forfeiture, whether civil or criminal, "is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam.*"  Bajakajian, 524 U.S. at 331 n.6, 118 S. Ct. at 2035 n.6.  Next, the Court observed that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality," and it explained that this principle dictates that "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  524 U.S. at 334, 118 S. Ct. at 2036.

19.     It also is evident from Bajakajian that the gravity of a failure-to-report violation, standing alone, is not necessarily sufficient to justify the forfeiture of the entire

19

amount not reported.  To the contrary, the Court held that a $357,144 forfeiture was constitutionally impermissible under the facts before it, where the defendant's failure-to-report violation "was unrelated to any other illegal activities," the seized currency "was the proceeds of legal activity and was to be used to repay a lawful debt," and the defendant did not "fit into the class of persons for whom the [reporting] statute was principally designed:  He is not a money launderer, a drug trafficker, or a tax evader." Bajakajian, 524 U.S. at 337-38, 118 S. Ct. at 2038.

20.    The subsequent enactment of CAFRA codifies the Bajakajian decision on many of these points.  Specifically, even if Bajakajian were viewed as limited to the context of criminal forfeitures, CAFRA expressly authorizes a claimant in a civil forfeiture proceeding to "petition the court to determine whether the forfeiture was constitutionally excessive."  18 U.S.C. § 983(g)(1).  CAFRA also adopts the Bajakajian standard for this inquiry, stating that "[i]n making this [excessiveness] determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture."  18 U.S.C. § 983(g)(2).

21.    CAFRA also establishes the procedure and burden of proof that governs this Court's "excessiveness" inquiry, providing that "[t]he claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury."  18 U.S.C. § 983(g)(3).

22.    The parties addressed this "excessiveness" issue through their proofs at trial, and then again in their post-trial submissions.  Accordingly, the Court finds that this

20

matter is ripe for resolution, with the trial having served as the "hearing" required under CAFRA.

23.     As noted, the Supreme Court held in <u>Bajakajian</u> that a criminal forfeiture of $357,144 was an excessive penalty for a crime that was "solely a reporting offense." <u>Bajakajian</u>, 524 U.S. at 337, 118 S. Ct. at 2038.  The factors cited in support of this ruling included: (i) that "[i]t was permissible to transport the currency out of the country so long as [the defendant] reported it," (ii) that the defendant's "violation was unrelated to any other illegal activities," (iii) that "[t]he money was the proceeds of a legal activity and was to be used to repay a lawful debt," and (iv) that the defendant did "not fit into the class of persons for whom the statute was principally designed:  He is not a money launderer, a drug trafficker, or a tax evader."  524 U.S. at 337-38, 118 S. Ct. at 2038 (footnote omitted).

24.     While certain of these factors support Claimants' claim of excessiveness here, others do not.  First, it is true here, as in <u>Bajakajian</u>, that Leila Farha permissibly could have taken the Defendant property out of the country so long as she reported it.  It also appears that the two largest negotiable checks, and presumably the remainder of the Defendant property as well, seemingly were "the proceeds of lawful activity," <u>Bajakajian</u>, 524 U.S. at 338, 118 S. Ct. at 2038 — namely, the sale of Claimants' property.

25.     The remaining considerations cited by the Supreme Court, however, serve to distinguish this case from <u>Bajakajian</u>.  First, the Government contends, and the Court agrees, that the reporting violation in this case was related to activity that is illegal under

21

the federal Internal Revenue Code.  If, in fact, Claimants sought to remove the Defendant

property from the country for the purpose of hiding these proceeds from the federal taxing

authorities, they could be criminally charged with tax evasion.  See 26 U.S.C. § 7201

(making it a felony to "willfully attempt[] in any manner to evade or defeat any tax

imposed by this title or the payment thereof"); see also United States v. Hook, 781 F.2d

1166, 1169-70 (6th Cir. 1986) (confirming that this statute criminalizes the concealment

of assets from the federal taxing authorities).

26.     At a minimum, the Government introduced ample evidence of Claimants'

failure to file tax returns over a several-year period, despite their obligation to do so.

This, too, constitutes a criminal violation under the Internal Revenue Code, provided that

this failure was "willful."  26 U.S.C. § 7203.  Claimants' sole excuse for their failure to

file federal tax returns was Amado Faria's claimed belief that no such filings were

necessary as long as no taxes were owed.  This is not the law, however, (see Gov't Ex.

13, Filing Thresholds for Years 1996-2000), as Faria surely should have known in light of

his business and accounting background.  In addition, Claimants' excuse for non-filing

lacks a factual basis, where their belatedly prepared tax returns revealed that they did, in

fact, owe taxes for at least two of these years, 1998 and 2000.

27.     Accordingly, the Court finds that the reporting violation that led to the

seizure of the Defendant property was related to illegal activity.  Specifically, Leila

Farha's failure to disclose the negotiable checks in her possession was part of a scheme to

evade Claimants' tax obligations by concealing taxable income.  Alternatively, this

reporting violation furthered Claimants' criminal activity of willfully failing to file required federal tax returns, where the seized property, if acknowledged and disclosed rather than concealed, would have clearly evidenced and confirmed Claimants' obligation to file a tax return for the year, 1998, in which they received this property.

28.     Claimants argue, however, that any legal requirement to file a return for the 1998 tax year, at least, was obviated when the Government seized the Defendant property before any such tax return would have been due.  Yet, even disregarding this property, Claimants' own belated 1998 tax return shows that they owed taxes for this year, and thus had an obligation to file a return even under their own theory of when such an obligation arose.

29.     In addition, the Government established, through the testimony of IRS Revenue Agent Selz, that Claimants had sufficient dominion and control over the Defendant property prior to its seizure to require that they disclose it on a 1998 tax return as "constructively received" despite its subsequent seizure.  See also 26 C.F.R. § 1.451-2(a) (providing that "[i]ncome though not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year," provided that the "taxpayer's control of its receipt is [not] subject to substantial limitations or restrictions").  The record establishes that Claimants had actual or constructive possession of the negotiable checks for several weeks, at least, before their seizure on November 28, 1998.

Indeed, Faria testified that he affirmatively put the two largest negotiable checks to his own economic use during this time, producing them as a deposit in support of his offer to purchase property in Tampa.  Any inability to take further advantage of these proceeds was attributable to Claimants' own actions or inaction, and thus does not overcome their obligation to disclose the seized property as income or gains on a 1998 federal tax return.  See, e.g., Walter v. United States, 148 F.3d 1027, 1029 (8th Cir. 1998) (observing that "[a] check in the hands of a taxpayer ordinarily means that funds are immediately available," and that "the general rule is that a check constitutes taxable income to a cash-basis taxpayer *when received*," and applying this rule despite the taxpayers' loss of a check before it could be deposited into their bank account); United States v. Romano, 938 F.2d 1569, 1572 (2d Cir. 1991) (rejecting the defendant's argument that he owed no tax obligation as to funds seized by customs officials and made subject to a civil forfeiture proceeding).

30.     In light of this Court's conclusion regarding the relationship between Leila Farha's reporting violation and criminal activity, this case is further distinguishable from Bajakajian.  The Supreme Court observed that the defendant in that case did "not fit into the class of persons for whom the [reporting] statute was principally designed:  He is not a money launderer, a drug trafficker, or a tax evader."  Bajakajian, 524 U.S. at 338, 118 S. Ct. at 2038 (footnote omitted).  The Court further noted that the defendant's "[f]ailure to report his currency affected only one party, the Government, and in a relatively minor way," and that "[t]here was no fraud on the United States . . . [and] no loss to the public

24

fisc." 524 U.S. at 339, 118 S. Ct. at 2039.

     31.    Here, in contrast, the reporting violation was committed in an attempt to avoid a tax obligation or, at a minimum, to avoid an obligation to file a federal tax return. This case, then, implicates one of the purposes the reporting statute is intended to serve. Under these circumstances, even a fairly substantial forfeiture would not run afoul of the Excessive Fines Clause. It remains only to decide whether the specific forfeiture sought in this case, totaling $200,230.69, "is grossly disproportional to the offense," such that it would violate the Excessive Fines Clause. 18 U.S.C. § 983(g)(4).

     32.    As noted by the Government, and as illustrated by the Supreme Court's analysis in <u>Bajakajian</u>, 524 U.S. at 338-39 & n.14, 118 S. Ct. at 2038 & n.14, the U.S. Sentencing Guidelines and the pertinent federal statutory penalties provide appropriate points of reference for comparing the amount of the forfeiture to the gravity of the offense giving rise to the forfeiture. Although Claimants suggest that it is inappropriate to consult such sources where they were never charged with or convicted of any tax-related offense, the case law in the wake of <u>Bajakajian</u> and the enactment of CAFRA, while admittedly limited, demonstrates that the Guidelines and statutory penalties are relevant to the proportionality inquiry in a civil forfeiture case even in the absence of criminal charges. <u>See</u>, <u>e.g.</u>, <u>United States v. One Parcel of Real Property Known as 45 Claremont St.</u>, 395 F.3d 1, 6 (1st Cir. 2004); <u>United States v. Collado</u>, 348 F.3d 323, 328 (2d Cir. 2003); <u>United States v. One Parcel of Property Located at 32 Medley Lane</u>, 372 F. Supp.2d 248, 262-66 & n.13 (D. Conn. 2005).

33.     Through Agent Selz's testimony at trial, the Government established that Claimants' gross income for 1998 exceeded $200,000, assuming that Claimants had properly reported the two largest negotiable checks totaling $171,671.69.  Under § 2T1.1 of the November 2001 Sentencing Guidelines and the accompanying notes, introduced as Government Exhibit 11 at trial, the tax loss stemming from Claimants' failure to file a 1998 tax return would be computed at twenty percent of their gross income, or over $40,000.  This tax loss, in turn, triggers a base offense level of 14.  See U.S.S.G. § 2T4.1(E) (included as part of Gov't Ex. 11).  Assigning two points for his prior felony convictions, Claimant Amado Faria would be placed in criminal history category II, resulting in a sentencing exposure of 18-24 months of imprisonment for a willful failure to file a 1998 tax return.  In addition, the Sentencing Guidelines recommend the imposition of a fine ranging between $4,000 and $40,000 for an offense level of 14.  See U.S.S.G. § 5E1.2(c)(3).

34.     The Government further established that the maximum fine for a willful failure to file a tax return is $25,000, see 26 U.S.C. § 7203, and that the maximum fine for tax evasion is $100,000, see 26 U.S.C. § 7201.  In addition, the maximum fine that could have been imposed for Leila Farha's criminal violation of the reporting statute was $250,000.  See 31 U.S.C. §§ 5316(a), 5322(a).

35.     Under these circumstances, where the reporting violation was related to unlawful tax-avoidance activity that lies within the core concerns of the reporting statute, and where a criminal conviction of such tax offenses would have resulted in a significant

26

prison term and monetary penalty, the Court cannot conclude that Claimants have met

their burden of establishing by a preponderance of the evidence that the forfeiture of just

over $200,000 in Defendant property is "grossly disproportional" to the offense giving

rise to the forfeiture, 18 U.S.C. § 983(g)(4), as required to establish a violation of the

CAFRA standards and the Eighth Amendment's Excessive Fines Clause.  The tax return

filing and tax payment violations that Claimants sought to advance through Leila Farha's

misrepresentations to customs officials were serious acts of criminal wrongdoing that

inflicted sizable losses upon the public fisc, and that, upon prosecution and conviction,

would have warranted substantial fines and likely prison terms.  It is clear in this case,

then, that even a substantial forfeiture would not be grossly disproportional to an

appropriate punishment for the criminal conduct that brought about the forfeiture.

36.     While the amount of the forfeiture here is perhaps somewhat greater than

the penalties that would have been imposed under the pertinent tax statutes and

Sentencing Guidelines, it is not so much larger that the forfeiture can be said to be grossly

disproportional.  Compare Bajakajian, 524 U.S. at 339, 118 S. Ct. at 2039 (noting that the

$357,144 forfeiture in that case was "larger . . . by many orders of magnitude" than the

$5,000 fine imposed by the district court for the defendant's underlying criminal

violation).  Rather, the modest disparity here, with a fine likely ranging in the tens of

thousands of dollars and a forfeiture amount of about $200,000, fits comfortably within

the ranges upheld by the courts against "gross disproportionality" challenges.  See 32

Medley Lane, 372 F. Supp.2d at 271 (collecting cases).

27

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that a judgment of forfeiture

shall be entered in favor of the Plaintiff United States and against the Defendant property.


                                    s/Gerald E. Rosen
                                    Gerald E. Rosen
                                    United States District Judge

Dated: September 30, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 30, 2005, by electronic and/or ordinary mail.

                                    s/LaShawn R. Saulsberry
                                    Case Manager